RECEIVED

AUG 2 7 2013

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA
BY:

**UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF LOUISIANA**

**SHREVEPORT DIVISION**

---

PATRICIA WILLIAMS

versus

CIVIL ACTION NO. 10-1670
JUDGE TOM STAGG

STATE OF LOUISIANA,
LOUISIANA STATE UNIVERSITY
HEALTH SCIENCES CENTER-
SHREVEPORT, ET AL.

---

## MEMORANDUM RULING

Before the court are a motion for summary judgment and a motion to strike filed by the defendants, the Board of Supervisors of Louisiana State University Agricultural & Mechanical College ("LSU") and Joe Miciotto ("Miciotto"), pursuant to Federal Rule of Civil Procedure 56. See Record Documents 50 and 63. For the reasons set forth below, the defendants' motion for summary judgment is **GRANTED**. The defendants' motion to strike is **DENIED as moot.**

## I. BACKGROUND

### A. Facts.

Patricia Williams ("Williams"), an African American, has worked at LSU's Health Sciences Center in Shreveport since 1975. See Record Document 57, Ex. A-1 at 1. Williams was originally employed as an operating room nurse until she

was promoted to Nursing Director in 1985. See id. In 1993, Williams was again promoted, this time to Assistant Hospital Administrator in the Ambulatory Care Division, which oversees the Health Science Center's outpatient care system. See id., Ex. A-1 at 2-3.

In 1995, Williams applied to be the Assistant Hospital Administrator for Patient Care Services/Chief Nurse Officer (hereinafter "CNO"), which oversees the inpatient care system. See id., Ex. A-2 at 33. However, Williams was not selected for an interview, and the position was filled by Jodi Alphin, a white female. See id. Williams again applied for the position in 2000. See id., Ex. A-2 at 36. Williams was selected for an interview, but the job went to Pamela Simmons ("Simmons"), Ph.D., an African-American female. See id., Ex. A-2 at 38. Williams applied for the position a third time in 2008 when Simmons retired. The events surrounding the 2008 selection process form the basis of this lawsuit.

Before Simmons retired in 2008, she recommended that Jean DiGrazia ("DiGrazia"), a white female and the Inpatient Nursing Director for Women's and Children's Services and for Surgical Services, be appointed interim CNO.[1] See Record Document 50, Ex. I at ¶ 7. Miciotto, the Hospital Administrator, approved

---

[1] When an incumbent administrator resigns or retires from the Health Sciences Center, it is their responsibility to recommend an interim replacement. See Record 50, Ex. I at ¶ 7.

Simmons's recommendation and DiGrazia was appointed as interim CNO. See id.

A selection committee was formed to fill the CNO vacancy. The selection committee was comprised of Miciotto, Betty Johnson ("Johnson"), the Associate Hospital Administrator, and Dr. Kevin Sittig ("Dr. Sittig"), the Senior Associate Dean of LSU Medical School and assistant to the Chief Medical Officer. See id., Ex. I at ¶ 8. In April 2008, LSU posted and publicly announced the opening for the CNO position. See id., Ex. B at 17-20. Numerous candidates, including Williams, submitted applications.

The selection committee narrowed the field of candidates to three semi-finalists: DiGrazia, Williams, and an external candidate, Della Austin ("Austin"). See id., Ex. B. at 17. Each of the three candidates was allotted a full day for interviews with the selection committee and various groups, including nursing managers and directors within the Health Sciences Center. See id., Ex. B at 37. The groups used evaluation sheets to score the candidates, which asked them to score the candidates' knowledge, experience, presentation, and suitability on a scale from zero to five. See id., Ex. B at Ex. 103. Of the three finalists, DiGrazia scored an aggregate of 142.5 in knowledge, 143.75 in experience, 141.25 in presentation, and a 137.75 in suitability. Williams scored an aggregate of 129 in knowledge, 136.5 in experience, 120 in presentation, and 106.5 in suitability.

Austin scored 102.5 in knowledge, 99 in experience, 90.5 in presentation, and 70 in suitability. Thus, DiGrazia scored the highest in all four categories.

After the interviews, the selection committee first eliminated Austin from consideration because the committee was not convinced that she was serious about relocating to Shreveport. See id., Ex. B at 42. Next, the committee reviewed the group evaluation scores and discussed their personal experiences with DiGrazia and Williams. Ultimately, the committee unanimously selected DiGrazia for the CNO position. See id., Ex. A at 60-64; Ex. B at 48; Ex. G at 43-44. Although each committee member found Williams qualified for the position, they found DiGrazia to be the best choice for the position because of her recent experience in the CNO position, her overall background in inpatient care, as well as DiGrazia's preferable management style and personality traits. See id.

Before DiGrazia retired on August 31, 2012, she recommended Jackie Robinson ("Robinson"), an African American, be appointed interim CNO. See Record Document 50, Ex. F at 6. Her recommendation was accepted and Robinson currently serves as interim CNO. See id. Williams continues to work at the Health Sciences Center as Assistant Administrator in the Ambulatory Care Division. See Record Document 57, Ex. A-1 at 1.

## B. Procedural Background.

On June 10, 2008, Williams filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against LSU, alleging that LSU unlawfully failed to promote her and denied her a pay increase because of her race. Miciotto was not named as a defendant in Williams's EEOC charge. See Record Document 50, Ex. J at 7. On July 7, 2010, Williams amended the charge to include a claim of retaliation. See Record Document 50, Ex. J at 13-14.

The EEOC took no action other than to issue a right to sue letter, which it issued Williams on August 6, 2010. See id., Ex. J at 17. On November 1, 2010, Williams filed suit in this court against LSU and Miciotto, alleging failure to promote, unequal rate of pay, retaliation, and hostile work environment pursuant to pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and 42 U.S.C. §§ 1981 and 1983, respectively. See Record Documents 1, 7, 18, and 33. Miciotto moved to dismiss Williams's claims against him pursuant to Federal Rule of Civil Procedure 12(b)(6). See Record Document 22. Magistrate Judge Hornsby filed a report and recommendation in which he recommended that Williams's hostile work environment claims be dismissed and ordered Williams to plead additional facts as to her retaliation claim. See Record Document 29. No objections to the magistrate's recommendations were filed, and this court entered

an order in accordance with the magistrate's recommendations, dismissing Williams's hostile work environment claims. See Record Document 34.

On April 26, 2013, the defendants filed a motion for summary judgment, seeking dismissal of all of Williams's claims. See Record Document 50. Williams opposed the motion. See Record Document 57. The defendants replied and also filed a motion to strike several exhibits submitted by Williams in opposition to the their summary judgment motion. See Record Documents 63 and 67.

## II. ANALYSIS

### A. Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts

showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment. Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

**B. Failure To Promote.**

Williams asserts that LSU and Miciotto failed to promote her to the CNO position because of her race in violation of Title VII and 42 U.S.C. §§ 1981 and 1983, respectively.[2] See Record Documents 1, 7, 18 and 33. Miciotto argues that Williams's failure to promote claim against him have prescribed under Louisiana's one-year prescriptive period, that Miciotto is entitled to qualified immunity, and that Williams's claims otherwise lack merit. Before analyzing the merits of Williams's claims against both defendants, the court will first address the

[2] Williams is unclear as to whether her claims against Miciotto are brought pursuant to section 1981 or section 1983. The Fifth Circuit has explained that racial discrimination claims against state actors in their individual capacity are founded on section 1981 but brought through section 1983 actions. See Felton v. Polles, 315 F.3d 470, 481-83 (5th Cir. 2002). The court will analyze her claims accordingly.

timeliness of Williams's claim against Miciotto.

**1. Timeliness Of Claim Against Miciotto.**

Section 1981 does not contain a statute of limitations. See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 371, 124 S. Ct. 1836, 1839 (2004). When a federal statute does not contain a statute of limitations, courts should apply "the most appropriate or analogous state statute of limitations." Id. Under Louisiana law, "[a] section 1981 claim is best characterized as a tort . . . and is, therefore, governed by the one-year prescriptive period for delictual actions dictated by [Louisiana Civil Code article] 3492." Taylor v. Bunge Corp., 775 F.2d 617, 618 (5th Cir. 1985). However, for actions arising under federal statutes enacted after December 1, 1990, courts must apply a catchall four-year statute of limitations. See 28 U.S.C. § 1658 ("Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.").

Section 1981 was originally enacted as part of the Civil Rights Act of 1866 and covered "only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." Patterson v. McLean Credit Union, 491 U.S. 164, 179, 109 S. Ct. 2363, 2374 (1989). Section 1981 "did not protect against harassing conduct that occurred after

the formation of the contract." Jones, 541 U.S. at 372, 124 S. Ct. at 1840 (citing Patterson, 491 U.S. 164, 109 S. Ct. 2363). Section 1981 was later amended by the Civil Rights Act of 1991 to create a cause of action for discriminatory and retaliatory conduct occurring after the formation of the contract. See id. Thus, the applicable statute of limitations depends upon whether the claim was actionable under the older version of section 1981 or is only made possible by the 1991 amendments. See id. at 382, 124 S. Ct. at 1845. Where the plaintiff's claim was available under the original section 1981, the court must apply the analogous state statute of limitations, which in Louisiana is one year. See id. at 371, 124 S. Ct. at 1839; Taylor, 775 F.2d at 618. However, where the claim is only available under section 1981 as amended, the cause of action is said to "arise under" the Civil Rights Act of 1991 and the federal four-year statute of limitations provided by section 1658 applies. See Jones, 541 U.S. at 382, 124 S. Ct. at 1845.

Failure to promote claims were actionable under section 1981, prior to the 1991 amendments, if "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." Patterson, 491 U.S. at 185, 109 S. Ct. at 2377. As the Supreme Court explained in Patterson, "only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable

under [section] 1981." Id. "In deciding whether a change of position rises to the level of a new and distinct relation, the court must compare the employee's current duties, salary, and benefits with those incident to the new position." Police Ass'n of New Orleans v. City of New Orleans, 100 F.3d 1159, 1170-71 (5th Cir. 1996). If the new position involves "substantial changes," the failure to promote claim was available under section 1981 prior to the 1991 amendments and Louisiana's one-year prescriptive period applies. See id.; see also Fonteneaux v. Shell Oil Co., 289 F. App'x 695, 699 (5th Cir. 2008). Otherwise, the claim is only available under section 1981 as amended and the four-year statute of limitations applies. See id.

To support his argument that a promotion from Assistant Administrator in the Ambulatory Care Division to CNO would have resulted in substantial changes to Williams's role at LSU's Health Sciences Center, Miciotto delineates the duties and responsibilities of each position. The Assistant Administrator in the Ambulatory Care Division supervises the hospital's outpatient care system, manages an annual budget of $28 million and oversees approximately 400 employees who primarily work from 8 a.m. to 5 p.m. See Record Document 50, Exs. I and J. Conversely, the CNO position supervises the inpatient care system, oversees over 1,200 employees whose shifts span 24 hours a day and 7 days a

week and manages an annual budget of over $100 million. See id., Ex. I. Williams's position reports to Betty Johnson, while the CNO reports directly to Miciotto. The CNO is also responsible to the Louisiana State Board of Nursing for all licensing and disciplining issues in the practice of nursing at the Health Sciences Center, whereas Williams's current position is not responsible for any such reporting. See id. Finally, had Williams been promoted, she would have received a pay increase because the CNO position is paid a higher salary than any other Assistant Administrator position. See id., Ex. J at ¶¶ 5-7, attachments 6, 7, 8 and 17.

Williams does not contest these differences, but argues that they are not sufficiently substantial so as to create a new contract with LSU. She highlights the facts that her *method* of compensation would not change–i.e. she would still be paid a salary with similar benefits–and that no new contract with LSU would be signed. See Record Document 57 at 38. She argues that such changes are not "meaningful" and that promotion to the CNO would "merely mark the continuation and natural upward progression of a high level managerial position."[3] Id.

Comparing Williams's current duties, compensation and benefits with that

[3] Williams calls such a promotion "natural" but she does not point to a single instance in the Health Science Center's history where the Assistant Administrator in the Ambulatory Care Division was promoted to CNO. See Record Document 57 at 38.

of the CNO, it is clear that promotion to the CNO position would constitute a "new and distinct" relationship between Williams and LSU. The CNO supervises inpatient as opposed to outpatient care, completely distinct functions of the hospital. The CNO oversees three times the number of employees who work around the clock as opposed to Williams's position which supervises normal business hour employees. In addition, the increase in salary accompanied by promotion to the CNO would not be merely a routine part of Williams's orginal contract of employment with LSU, but instead would be commensurate with the substantial changes in authority and responsibility.

For these reasons, the court finds substantial differences in the duties and salaries between the positions of CNO and Williams's current position. Thus, promotion to the CNO would result in a new relationship between Williams and LSU. Given that "the opportunity to enter into a new contract with the employer" was actionable under section 1981, Louisiana's one-year prescriptive period applies to Williams's failure to promote claim against Miciotto. LSU promoted DiGrazia to the CNO position over Williams in April 2008. Williams filed her complaint in August 2010, which is more than one year after her claim against Miciotto arose. Therefore, applying the one-year prescriptive period, Williams's claim for failure to promote against Miciotto has prescribed.

**2. Merits Of Failure To Promote Claims Against LSU And Miciotto.**

The court now moves to the substance of Williams's failure to promote claims against the defendants.[4] To establish a prima facie case of race discrimination based on a failure to promote, the plaintiff must demonstrate: (1) that the employee is a member of a protected class; (2) that she sought and was qualified for the position; (3) that she was rejected for the position; and (4) that the employer continued to seek or promoted applicants with the plaintiff's qualifications. See Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 354-55 (5th Cir. 2001)(citing Haynes v. Pennzoil Co., 207 F.3d 296, 300 (5th Cir. 2000)). For cases of discrimination based on circumstantial evidence, the court applies the McDonnell Douglas burden-shifting analysis. See Davis v. Dallas Area Rapid Transit, 383 F.3d 309, 316-17 (5th Cir. 2004)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973)). "A plaintiff relying on circumstantial evidence must put forth a prima facie case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." Berquist v. Wash. Mut. Bank, 500 F.3d 344, 349 (5th Cir. 2007)(citations omitted); Davis, 383 F.3d 309, 316-17. If the employer

[4] Despite finding that Williams's failure to promote claims have prescribed against Miciotto, the court, in an abundance of caution, will address the merits of Williams's claim against Miciotto as well as LSU.

provides a legitimate, non-discriminatory reason for the employment decision, the plaintiff must submit evidence showing that the employer's stated reason was merely pretextual. See Davis, 383 F.3d at 317 (citations omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097 (2000) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089 (1981)).

LSU and Miciotto concede that Williams has established a prima facie case, but assert that they had a valid, non-discriminatory reason for hiring DiGrazia over Williams: that DiGrazia was better qualified based on her experience and interpersonal skills.

The defendants first argue that DiGrazia was better qualified for the position based on her role as interim CNO. See Record Document 50 at 15-19. Although DiGrazia was interim CNO for only a few short months, DiGrazia had also filled in for her predecessor, Simmons, when Simmons was away on vacation or was sick. The other administrators stated that DiGrazia did an excellent job as CNO and they point to a specific instance when DiGrazia's crisis management skills were on

display after a water pipe broke in the middle of the night and flooded a portion of the Health Sciences Center. See Record Document 50, Ex. A at 68-74; Ex. D at 52-53; Ex. G at 64-65.

LSU and Miciotto also argue that DiGrazia's prior experience as Inpatient Nursing Director over two separate services, the Women's and Children's Services and Surgical Services, was more relevant than Williams's experience as an Assistant Administrator because DiGrazia worked in the inpatient care system, the system of the hospital which is run by the CNO. Conversely, Williams had spent the last twenty years managing the outpatient care system. See Record Document 57, Ex. A-1 at 1-2.

In addition to DiGrazia's experience, LSU and Miciotto assert that DiGrazia was better qualified because DiGrazia's interpersonal skills were better suited for the CNO position. According to the defendants, Williams was often short-tempered, hostile, and aggressive toward both her superiors and subordinates. In support, they submit affidavits and deposition testimony of numerous administrators who interacted with Williams on a daily basis and who testify regarding Williams's behavior.

Since 1993, Miciotto supervised and evaluated Williams observed that her conduct was noticeably different from other hospital administrators, particularly in

the morning meetings. Specifically, "[h]er tone, her aggressiveness, her use of intimidation" made her stand out in a negative way. See Record Document 50, Ex. A at 79. She would shout, jump up and down, and pace the room. See id., Ex. A at 80. During one period of time, she refused to attend the morning meetings, even though attendance at the meetings is mandatory. See id., Ex. A at 79. Miciotto asked her to leave several meetings due to her behavior and has counseled her extensively on how she might improve her behavior. See id. He was so concerned about Williams's behavior and its effect on her unit that, in the early 1990s, he arranged for her to attend a leadership training course at the University of Minnesota. See id., Ex. A at 209-11. LSU covered all expenses and the program cost several thousand of dollars. See id., Ex. A at 211. However, Williams only attended one session before dropping out of the program. See id.

Another participant in the morning meetings, Betty Johnson ("Johnson"), testified that Williams "did not have the leadership skills to build a collaborative team" because Williams would frequently jump to conclusions, act in a confrontational and aggressive manner, and would roll her eyes and shake her head when she did not believe what was being said.[5] See id., Ex. B at 27-31. Mark

[5] Such conduct was on display during Sittg's deposition, when Williams interrupted him by mouthing "that's a lie" while Dr. Sittig was answering a question. See id., Ex. G at 52-53.

Randolph ("Randolph"), the Assistant Administrator for Professional Services, stated that Williams frequently used a "raised voice and condescending tone." Id., Ex. D at 20. Randolph also witnessed Williams publicly embarrass one of her subordinates, which Randolph considered to be very unprofessional. Id., Ex. D at 107-108. He stated that Williams exhibited a pattern of confrontational behavior. See id., Ex. D at 121-122.

These comments are merely a brief summary of some her colleagues' opinions. The people she works with describe specific encounters where Williams lashed out, raised her voice, threw a tantrum, used personal insults, and otherwise acted unprofessionally. On the other hand, Dr. Sittig stated that DiGrazia was "endearing, approachable, and open." Id., Ex. G at 131. He also stated that it is critical for the CNO to have a temperament like DiGrazia's because "for [the CNO] to be successful they have to have an approachable relationship that everybody feels that they have the ability to voice concerns, be heard, and be dealt with in a friendly environment." Id., Ex. G at 131. It was not just other administrators who doubted Williams's ability to work with the inpatient care managers because, according to Miciotto, there were several negative evaluations from inpatient nursing directors expressing concerns over Williams's managerial style. See Record Document 50, Ex. A at 63.

An employer's decision to hire a more qualified candidate is a legitimate, nondiscriminatory reason for an adverse employment action. See Patrick v. Ridge, 394 F.3d 311, 318 (5th Cir. 2004). The defendants have submitted evidence that DiGrazia was better qualified for the CNO position based on her experience and personal characteristics. Therefore, LSU and Miciotto have met their burden of setting forth a valid, non-discriminatory reason for their decision to hire DiGrazia over Williams.

**a. Pretext.**

Because the defendants have set forth a legitimate reason for their decision to promote DiGrazia over Williams, the burden now shifts to Williams to present evidence that LSU's stated reasons are merely pretextual. See Davis, 383 F.3d at 317 (citations omitted). "To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer." Id. A plaintiff may establish pretext by showing (1) that a discriminatory motive more likely motivated her employer's decision by such evidence as disparate treatment, or (2) that the employer's explanation is unworthy of credence. See Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 220 (5th Cir. 2001) (quoting Defenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581, 589 (5th Cir. 1998)). When conducting a pretext analysis, the court is not to engage in second-guessing an

employer's business decisions. See LeMaire v. La. Dept. Of Transp. & Dev., 480 F.3d 383, 391 (5th Cir. 2007). The Fifth Circuit has stated that "[o]ur anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones." Id. (citing Little v. Republic Ref. Co., Ltd., 924 F.2d 93, 97 (5th Cir. 1991)).

Williams questions the credence of the defendants' proffered reason, arguing that she was more qualified than DiGrazia for the CNO position. A showing that Williams was "clearly better qualified" than DiGrazia would be sufficient to show pretext. See Moss v. BMC Software, Inc., 610 F.3d 917, 922 (5th Cir. 2010). However, to satisfy this standard, the plaintiff must submit evidence establishing that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 357 (5th Cir. 2001)). "This evidence must be more than merely subjective and speculative." Nichols v. Loral Vought Sys. Corp., 81 F.3d 38, 42 (5th Cir. 1996). "[T]he bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination." Celestine, 266 F.3d at 357 (5th Cir. 2001).

Williams advances several arguments as to why she was more experienced, but she has wholly failed to establish that she was "clearly better qualified." First,

she argues that she was more qualified because she served as an Assistant Administrator for fifteen years, whereas DiGrazia had only served as a head of her department. However, the case law in this circuit is clear that length of experience alone is insufficient to satisfy the plaintiff's burden in this context: "[A]n 'attempt to equate years served with superior qualifications . . . [is] unpersuasive.'" Moss, 610 F.3d at 923 (quoting Bodenheimer v. PPG Indus., 5 F.3d 955, 959 (5th Cir. 1993)). In addition, LSU and Miciotto have shown that DiGrazia's experience was more relevant to the CNO position, because it involved overseeing inpatient care at the Health Sciences Center, as opposed to Williams's experience supervising outpatient care.

Next, Williams cites testimony from Dr. Sittig and others who admit that Williams was qualified to be CNO. Such testimony is unhelpful because it shows only that Williams was, at best, only *as qualified* for the CNO position as DiGrazia, which falls short of her burden that she establish that she was "clearly better qualified" than DiGrazia. See EEOC v. La. Office of Cmty. Servs., 47 F.3d 1438, 1445 (5th Cir. 1995).

Finally, Williams offers the expert opinion of Dr. Sam Steinberg ("Dr. Steinberg"), a self-described "consultant to hospitals and attorneys regarding hospital administrative issues," who opines that Williams was significantly more

qualified than DiGrazia for the CNO position. See Record Document 57, Ex. H. Excluding the qualification and signature pages, the entire report constitutes two pages and contains only conclusory opinions. See id. The Fifth Circuit has repeatedly held that conclusory expert opinions cannot create a genuine issue of material fact:

> We have repeatedly rejected the use of expert affidavits in this way to create issues of material fact at the summary judgment stage. See Hayter v. City of Mt. Vernon, 154 F.3d 269, 274 (5th Cir.1998) (holding that "affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment[,]" and that "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." (quoting Orthopedic & Sports Injury Clinic v. Wang Lab., Inc., 922 F.2d 220, 225 (5th Cir.1991))); Boyd v. State Farm Ins., 158 F.3d 326, 331 (5th Cir.1998) ("It is a well established rule that without more than his credentials and a subjective opinion, an expert's testimony that a medical condition simply 'is so' is not admissible."); Yaquinto v. Segerstrom, 247 F.3d 218, 227 (5th Cir. 2001) (rejecting expert evidence that consisted of a conclusive allegation as to cause).

Crayton v. Amadeo Rossi, S.A., 384 F. App'x 330, 332-33 (5th Cir. 2010). The Fifth Circuit has applied this rule in affirming exclusion of such reports in the context of employment discrimination suits. See e.g., Celestine, 266 F.3d 343 at 357. Accordingly, the court will not consider the expert's conclusory opinions.[6]

---

[6] Even had the court considered Dr. Steinberg's report, the court would have reached the same result because the report does not show that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Celestine, 266 F.3d at 357 (5th

Williams also challenges the credence of the defendants' reason regarding Williams's interpersonal skills. She submits affidavits and deposition testimony of other Health Sciences Center employees who state that Williams was not aggressive or intimidating. For example, she provides deposition testimony of Pat Cochran ("Cochran "), Miciotto's secretary, who stated that she had not witnessed Williams's aggressiveness. See Record Document 57, Ex. N at 6, 19. However, Cochran was not an administrator and was not present at the mornings meetings where the behavior cited by Miciotto, Dr. Sittig, Johnson and others was on display.

The evidence offered by Williams does not show that the defendants' stated reason is "unworthy of credence." At most, it merely proves that in these particular employees' experience, Williams was not aggressive. Williams's character witnesses do not call into question whether specific instances of aggression mentioned by the other administrators actually occurred, nor do they undermine the other administrators' credibility. Williams also has provided no evidence to contradict the defendants' evidence that DiGrazia possessed the personal qualities necessary to be CNO such as being "endearing, approachable, and open." Record Document 50, Ex. G at 131. Accordingly, Williams has not

---

Cir. 2001).

created a fact issue as to the credence of the defendants' stated reason regarding DiGrazia's superior interpersonal and communication skills.[7]

**b. Other Alleged Bases Of Pretext.**

Williams attempts to show that a discriminatory motive more likely motivated her employer's decision by alleging three other bases of pretext. However, her claims are poorly supported and merit little consideration from this court.

First, Williams claims that Miciotto referred to her as an "angry black woman." This is simply untrue. In a deposition for a separate, unrelated case, Miciotto was asked by the plaintiff's attorney if "he would characterize [Williams] as an angry black woman." See Record Document 57, Ex. D-2 at 176-77. Over objection by counsel, Miciotto answered "On occasions, yes." Id. Miciotto went on to state that he had never used that term and did not know its potential racial connotation. See id. Even had Miciotto used that term, it would still not prove pretext because "a comment is not evidence of discrimination if . . . it is not made

[7] Williams also calls the defendants' reasoning regarding her interpersonal skills into question by claiming that the defendants never recorded any complaints about her behavior in her personnel file. The record contradicts that claim. Miciotto had noted, on many occasions, that her communication skills needed improving, had counseled her extensively about the issue, and even paid for her to attend a leadership training course. See Record Document 50, Ex. A at 78-80, 86-88, 92-93, Exs. 146-157.

in temporal proximity to the adverse employment decision." Cervantez v. KMGP Servs. Co., Inc., 349 F. App'x 4, 11 (5th Cir. 2009). Given that the deposition was on September 4, 2012, over four years removed from the defendants' decision to hire DiGrazia over Williams, any such remark was not made in proximity to the adverse employment decision. See Record Document 57, Ex. D-2 at 1.

Second, Williams argues that the way Johnson, Miciotto, and Dr. Sittig describe her behavior reflect racist stereotypes. In support, she submits a report prepared by Dr. Matthew Weeks ("Weeks"), a psychology professor at Centenary College of Louisiana. See Record Document 57, Ex. G-1. In it, Weeks states that the administrators' characterizations of Williams's behavior as "aggressive" and "intimidating" *could be* stereotypes. See id. A stereotype is "something conforming to a fixed or general pattern and lacking distinguishing marks or qualities." Webster's Third New International Dictionary 2238 (4th ed. 1976). The administrators testifying as to Williams's character have known and worked closely with her for decades. They do not merely describe her behavior in general terms, but also provide specific examples of how she manifested aggressiveness and hostility. Indeed, they point to her distinguishing traits, characteristics which set her apart from both whites and African Americans alike. Even if the court accepted his analysis, Weeks only concludes that there *could* be bias or

stereotypes, which does not satisfy Williams's burden that she show the defendants' actions were *more likely* motivated by a discriminatory motive. See Wallace, 271 F.3d at 220.

Williams also claims there was a pattern of racial discrimination at LSU. Her only support for such claim is the conclusory report of Dr. Steinberg, which the court will not consider for the reasons previously outlined, and an affidavit of Terri Lyons ("Lyons"), the Equal Employment Opportunity officer at the Health Sciences Center from 1999 to 2003. See Record Document 57, Ex. O. The affidavit is rambling and riddled with hearsay and unsubstantiated assertions. Morever, by her own admission, Lyons has no personal knowledge of the defendants' decision to hire DiGrazia over Williams because she was not employed at LSU when that decision was made in 2008.[8] Nor can she testify that any alleged pattern of discrimination existed beyond 2003.[9] For these reasons, the

[8] In response to Williams' s memorandum in opposition to defendants' motion for summary judgment, the defendant filed a motion to strike several of Williams's exhibits, including Lyons's affidavit. See Record Document 63. This court is aware of Rule 56's admonition that only admissible evidence may be considered in ruling on a summary judgment motion. See Stults v. Conoco, Inc., 76 F.3d 651, 654-55 (5th Cir. 1996). The court--fully cognizant of the evidentiary standards--will consider Williams's exhibits, giving the statements due weight and appropriately discounting any improper statements and evidence. Therefore, the defendants's motions to strike is DENIED as moot.

[9] The only pattern the court can discern from admissible evidence is the pattern of equal opportunity for administrative positions at LSU's Health Sciences Center. A

court finds Lyons's affidavit insufficient to establish that a pattern of race discrimination existed at LSU.

At the summary judgment stage, "[t]he question is whether [the plaintiff] has shown that there is a genuine [dispute] of material fact as to whether this reason was pretextual." Jackson v. Cal-W. Packaging Corp., 602 F.3d 374, 378-79 (5th Cir. 2010). Besides conclusory assertions, Williams has submitted no evidence that she was "clearly better qualified" than DiGrazia for the CNO position. Nor has Williams established that the defendants' nondiscriminatory reason is unworthy of credence or is more likely motivated by a discriminatory motive.[10] See Wallace, 271 F.3d at 220. Accordingly, the defendants are entitled to summary judgment on Williams' failure to promote claims.

**C. Retaliation.**

Williams alleges that LSU and Miciotto retaliated against her after she filed

---

listing of the previous four CNOs, in chronological order, is illustrative: Alphin (white), Simmons (African American), DiGrazia (white), and Robinson (African American). See Record Document 50, Ex. F at 6; Record Document 57, Ex. A-2 at 33-38.

[10] Although some of the criteria used by LSU and Miciotto to evaluate Williams was subjective, "an employer's subjective reason for not selecting a candidate . . . may serve as a legitimate, non-discriminatory reason" for the employer's decision if the employer "articulates a clear and reasonably specific basis for its subjective assessment." Alvarado v. Tex. Rangers, 492 F.3d 605, 616 (5th Cir. 2007). The court finds the defendants have articulated a clear and reasonably specific basis for subjective criteria they used in hiring a CNO in 2008.

her EEOC charge. To establish a prima facie case of retaliation, the plaintiff must demonstrate that: (1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action.[11] McCoy v. City of Shreveport, 492 F.3d 551, 556-57 (5th Cir. 2007). Once the plaintiff establishes her prima facie case, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for its employment action. See Aryain v. Wal–Mart Stores Tex. LP, 534 F.3d 473, 484 (5th Cir. 2008). If the employer provides a non-retaliatory reason for its employment action, the burden shifts back to the plaintiff to prove that the employer's reason is a pretext for the actual retaliatory reason. See id.

The defendants do not contest that Williams, in filing her EEOC charge, engaged in activity protected by Title VII.[12] Instead, they maintain that Williams cannot establish the second element of her prima facie case because any actions they took are too trivial to constitute adverse employment actions. For purposes of

[11] The elements for establishing a prima facie case of retaliation pursuant to section 1981 are identical to those that must be established under Title VII. See Decorte v. Jordan, 497 F.3d 433, 437 (5th Cir. 2007); Foley v. Univ. of Houston Sys., 324 F.2d 310, 316 (5th Cir. 2003).

[12] See Grimes v. Tex. Dept. Of Mental Health & Mental Retardation, 102 F.3d 137 140 (5th Cir. 1996)("An employee has engaged in activity protected by Title VII if she has . . . made a charge. . . under Title VII.").

retaliation claims, an adverse employment action is defined as an action that is "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006). "Material" adversity must be more than trivial harm, and "petty slights or minor annoyances that often take place at work and that all employees experience" are not actionable. Id.

Most of the actions cited by Williams in her pleadings and affidavit are clearly minor or slight annoyances which fall short of the "materially adverse" requirement. For instance, Williams points to instances of Miciotto referring to Williams as "she" instead of by her proper name, excluding her from inter-staff communications, not inviting her to certain events, and other forms of "snubbing." See Record Document 57 at 44-46. Personality conflicts and "snubbing" are not materially adverse employment actions and, thus, are not actionable. See Burlington, 548 U.S. at 68, 126 S.Ct. at 2415.

Williams alleges two other retaliatory acts. First, without a single citation to the record, she claims that LSU paid her employees lower salaries relative to other administrators' employees. See Record Document 57 at 47-48. Williams produced over 3,000 pages in opposition to the defendants' motion for summary

judgment.[13] "[Rule 56] does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996) (citing Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994)). Even had she properly supported the claim, she did not show that this alleged pay disparity dissuaded her from engaging in protected activity. See Burlington, 548 U.S. at 68, 126 S.Ct. 2405 (2006).

Second, Williams alleges that Miciotto retaliated against her by placing a negative and untrue notation in her personnel file six days after she delivered her discrimination charge.[14] In Harrison v. Corrections Corporation of America, 476 F. App'x 40, 44 (5th Cir. 2012), the Fifth Circuit found that a similar negative employee evaluation constituted "nothing more than 'trivial harm[s],' which the materiality requirement is intended to separate from significant harms." In Stewart

[13] Despite this court's mandatory electronic filing requirements, counsel for Williams did not electronically file their voluminous exhibits. See L.R. 5.7.01. Instead, counsel manually attached the exhibits, forcing the clerk of court to scan thousands of pages of exhibits.

[14] Williams cites two cases, Carter v. Target Corporation, 2012 WL 4867719 (W.D. La. Oct. 12, 2012), and Willis v. Cleco Corporation, 2013 WL 686493 (W.D. La. Feb. 22, 2013) for the proposition that a negative notation in an employee's personnel file constitutes an adverse employment action. Neither case does so. The court in Carter merely allowed such allegations to proceed beyond a motion to dismiss, while this court never reached that issue in Willis because the defendant assumed the plaintiff had established a prima facie case.

v. Mississippi Transportation Company, 586 F.3d 321, 331-32 (5th Cir. 2009), the employee alleged that as a result of filing her complaint, she was placed on administrative leave for three weeks, reassigned to a new supervisor and given a heavier workload, had personal items removed from her desk and the locks changed to her office, and was chastised by her supervisors and ostracized by her co-workers. The Fifth Circuit found that these acts, which are significantly more egregious than those present here, would not deter a reasonable employee from making a charge of discrimination. See id. at 332. In reaching its conclusion, the court relied upon the fact that the plaintiff's job title, grade, hours, salary or benefits were not affected by the employment actions. See id. (citing Burlington, 548 U.S. at 71, 126 S.Ct. at 2417). Similarly, in this case, Williams has shown no evidence that any of these conditions of her employment were altered by an employment action taken by the defendants. To the contrary, Williams demonstrated her lack of deterrence by amending her charge after the defendants allegedly retaliated against her. See e.g., Muttahottil v. Gordon H. Mansfield, 381 F. App'x 454 (5th Cir. 2010)("Indeed, [the plaintiff] himself was undeterred by [his supervisor]'s comment: a few months later he filed an EEO complaint alleging seven distinct forms of discrimination . . . .").

The Supreme Court has repeatedly stated that Title VII is not a "general

civility code for the American workplace." Burlington, 548 U.S. at 68, 126 S.Ct. at 2415 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998 (1998)). Instead, the purpose of the antiretaliation provision is to prevent employers from "deter[ring] victims of discrimination from complaining to the EEOC." Id. (citations omitted). See Burlington, 548 U.S. at 68, 126 S.Ct. at 2415. Williams has not produced any evidence showing that she was deterred from pursuing her EEOC charge or engaging in any other protected activity as a result of actions taken by the defendants. Therefore, applying the Burlington standard, Williams has not established a prima facie case of retaliation.

**D. Unequal Pay.**

Williams's unequal pay claim is unusual in that she does not argue that she was paid less in absolute terms, but rather she asserts the defendants discriminated against her by raising her salary at a slower rate than they did for the salaries of four other white administrators, Mark Randolph, Betty Johnson, Leisa Oglesby, and Jean DiGrazia. See Record Document 33. The defendants argue in their motion for summary judgment that Williams has not established a prima facie case of wage discrimination, and even if she has, that they have a valid, non-discriminatory reason for the discrepancies in pay raises. To establish a prima facie case of wage discrimination, Williams must show that (1) she was a member

of a protected class and (2) that she was paid less than a nonmember for work that requires substantially the same responsibilities. See Taylor v. United Parcel Serv., Inc., 554 F.3d 510, 523 (5th Cir. 2008)(citing Uviedo v. Steves Sash & Door Co., 738 F.2d 1245 (5th Cir. 1984)). The same McDonnell Douglas applies here: "A plaintiff relying on circumstantial evidence must put forth a prima facie case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." Berquist v. Wash. Mut. Bank, 500 F.3d 344, 349 (5th Cir. 2007)(citations omitted); Davis, 383 F.3d 309, 316-17. If the employer provides a legitimate, non-discriminatory reason for the employment decision, the plaintiff must submit evidence showing that the employer's stated reason was merely pretextual. See Davis, 383 F.3d at 317 (citations omitted).

First, Williams points to Mark Randolph, a white male and the Assistant Hospital Administrator for Professional Services. See Record Document 50, Ex. D at 8. Randolph began working for LSU's Health Sciences Center in 1987 as a Respiratory Care Assistant. See id., Ex. D at 12. In 1998, he was promoted to Director of Cardiopulmonary Services and earned a salary of $58,578. See Record Document 62, Ex. J at 4. His annual salary increased to $92,000 when he was promoted to Assistant Hospital Administrator in 2006. See id. By 2008,

Randolph's salary had risen to $104,328.

Second, LSU hired Betty Johnson in 1985 as a Director of Respiratory Therapy. See Record Document 50, Ex. B at 9. In 1990, she was promoted to Assistant Hospital Administrator for the Outpatient Clinic Division, which paid $52,000. She was promoted to Assistant Hospital Administrator for Professional Services in 1993, and finally to Associate Hospital Administrator in 2006. See id., Ex, B at 8-9. In 2008, Johnson's salary was $151,593.

Third, Leisa Oglesby began working for LSU as an Assistant Quality Assurance Coordinator, and became an Assistant Hospital Administrator in 2000. At that time, she earned a salary of $72,000. See Record Document 62, Ex. J at 5. In 2007, her last year as an Assistant Administrator, Oglesby earned $102,438. See id.

Fourth, Jean DiGrazia earned $61,247 in 2000 as Director for Women's and Children's Services and for Surgical Services. See id., Ex. J at 7. She made $95,108 as interim CNO and her salary was increased to $145,000 when she was permanently selected as CNO. See id.

When Williams was promoted to Assistant Hospital Administrator in the Ambulatory Care Division in 1993, she began earning an annual salary of $55,000. See Record Document 62, Ex. J at 2. Over the course of the following fifteen

years, Williams received several merit and equity salary increases. See id. In 2008, she earned $115,161.

Williams argues that the salary histories show that her salary was raised at a lesser percentage than the other white administrators. However, it is impossible to glean any meaningful information from this data sample. Even if the court were to accept that the data shows Williams was paid less than the other white administrators, she has submitted no evidence that the white employees performed work that requires substantially the same responsibilities.[15] It is not enough that Williams cites to other administrators, because the court cannot assume that those jobs are substantially similar. On the other hand, LSU has submitted evidence that each administrator performed different tasks and administered greater or lesser employment budgets. Accordingly, Williams has not established a prima facie case of wage discrimination because she has not shown that her job responsibilities were substantially similar to members outside of her protected class.[16]

---

[15] In fact, Williams's opposition brief actually concedes that she cannot meet her prima facie case: "No evidence of a comparable is necessary since Plaintiff is not seeking equal wages for work but for equal treatment for equal rates of raises." Record Document 62 at 4.

[16] Even had Williams made out a prima facie case, the court would have reached the same result. The defendants offered a legitimate, non-pretextual reason for any disparity in pay raises: that each administrator had different responsibilities. Williams did not dispute the defendants' asserted non-pretextual reason for the disparity in salaries.

## III. CONCLUSION

Based on the foregoing analysis, the defendants' motion for summary judgment (Record Document 50) is **GRANTED** and Williams's claims against the defendants are **DISMISSED WITH PREJUDICE**. The court finds there is no genuine dispute as to any material fact with regard to any of Williams' claims against either of the defendants. The defendants' motion to strike (Record Document 63) is **DENIED as moot.**

A judgment consistent with the terms of this Memorandum Ruling will issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this the 27th day of August, 2013.



JUDGE TOM STAGG